The government has conceded one of the errors in terms of the arguments made in the opening brief, and that's with respect to the ex post facto application of the new definition in terms of number of victims, and agrees that the case should be remanded for resentencing. How come nobody caught that? Well, Mr. Thompson did represent himself pro se, and so if we view that as, you know, the crucible of testing, perhaps, you know, lack of access to Your office certainly would have caught it. Certainly, Your Honor, we would have caught that. Many people apparently haven't, though, when I've looked at the case law. Yeah, there's quite a bit of case law. Unfortunately. So we're glad we caught it now. We're glad that the government has recognized the error. And so then the question for the court today, if you'll accept their concession and agree that it should be remanded, is what else? What else needs to be decided? What else should be decided? One thing is whether that remand should be on an open or closed record. I would also suggest that the court should decide the issue of restitution. Let me ask, what do you mean open or closed record? Do you have additional evidence you would want to introduce? We do not in terms of the issue of the number of victims. We're asking for remand on a closed record on that issue. The government has argued in their brief that they would like an opportunity to prove up actual pecuniary harm to some of the victims of the, you know, the people whose identities were used who would now be victims under the new definition. Wouldn't that be particularly appropriate given the fact that the wrong guideline was used? Yes and no. Mr. Thompson did object and say that the IRS was the only victim. And in response, the government did produce additional evidence. Mr. Thompson specifically asked for copies of the victim impact statements, which had been solicited and collected by the government. Probation talked about them in the probation report. And all of that evidence that, you know, could have been found was found and discussed. And so I think that the record is closed on that. I think what the government is suggesting is more than that, is that they want now to go and to develop additional evidence and to possibly interview some of these individuals and figure out, you know, did they have delays in processing? Were there other problems? It seems that they really did have that opportunity. The case law that would have supported that kind of analysis was already in existence at the time of the sentencing. So we are at least requesting that the court consider remanding on this issue on a closed record. The case certainly has been fully developed with that issue, you know, presented to the government and to the court. And it just seems like more forests to be destroyed in the aid of not much additional time to be given to Mr. Thompson. In addition to that, the court should resolve the restitution issue, both the scope question and the proof question, and the 1546 question. The court could also reach some of the other sentencing issues, although I will admit that they may look different after a remand. Some different objections may be made. So standards of review may be different. Different arguments may be made. The government certainly has come up with additional creative, I would argue not meritorious, but creative arguments with respect to some of the... And he wasn't represented at sentencing either? Pardon? No, Mr. Thompson moved to represent himself at sentencing. He was represented by counsel during trial. Okay, so at sentencing. He had advisory counsel during the sentencing, but he represented himself. Okay. And he asked to represent himself here, but the appellate commissioner gave him me instead, given that Matthews v. California doesn't allow him to represent himself. He would really like to be here himself arguing this case, though. And so those other sentencing issues, including the obstruction enhancement, I think that one clearly also needs to be reversed, although I'll be the first to admit that on remand I think the judge will understand that he needs to make those findings, and I don't doubt the government's position that he will make those findings, but I do think under this Court's law it has to be reversed. And if we back out those new arguments, those new creative arguments that I referenced, and we look at what the PSR actually recommended and what the Court therefore actually adopted when it adopted the PSR in response to Mr. Thompson's objection, it recommended that personal tax returns, you know, are a means of identification and therefore that enhancement can be applied. I think that the law doesn't support that. So on remand we might have different arguments, and so I don't know that the Court really needs to reach that. So you would just ask us to vacate the sentence and remand for resentencing, almost in a de novo thing but on a closed record? Yes. Okay. Can we talk about the two counts under 18 U.S.C. section 1546? Yes, Your Honor. Focus on that. So the marriage of two different sections of the criminal code in 1948 when the committee was, you know, concerned with consolidating and combining and being efficient still resulted in one section that talks about visas and permits and other sections that talk about passports. And that has never changed. And so they did not see those as duplicative at the time. They didn't fold them in together. And the government's position is that the 1986 amendments somehow now change it and include passports and passport cards even though they're never mentioned. And I don't think that any of the case law suggests that if we look at the entire history, that that section applies to anything other than documents utilized by aliens to enter the country and that that's what it's aimed at. And, you know, if you take the language out of context and out of the statute and out of the title of the statute, then certainly a passport is used for entry, but it's used by U.S. citizens for entry. And so I understand that Franklin is a very detailed opinion and that a district court has, you know, evaluated the legislative history in the plain language in a different way. And this court, you know, adopted that in a very short sentence in an unpublished Ninth Circuit opinion. But wouldn't that conflict with Kerstick, with our opinion in Kerstick? And I think it does, and that is certainly our position. And Kerstick, you know, interpreting what does any such mean and the way they talk about it. And if we even go back and look at Campo Serrano, some of which is, you know, good law, even though Congress sort of overruled it in part. I mean, everyone when they're talking about this statute is talking about the visas and the permits and the border crossing cards and the green cards that are issued to aliens. And I think there's been some creep in the case law. And certainly you can find some creep in the case law that takes it beyond that, but doesn't take it to passports. And it would undermine what happened in 1948 when we're consolidating legislation when we didn't consolidate it because we thought they were separate things. Your argument has some surface appeal. And, you know, when I originally looked at this case, I was thinking, well, gee, 1546 seems coextensive with 1543 with regard to passports. So that seemed odd to me. But then when I read them more carefully, 1543 actually broadens it because 1546 broadens 1543 because 1543 doesn't include possession or uttering of a passport, whatever uttering might mean. 1546 does, and the indictment charged him with, among other things, covered by 1543 possession and uttering, which is only covered by 1546. So... Well, I mean, in terms of the entire section, I think it's 1541 up through 1547, if I'm not wrong. I think that the conduct, right, taking a valid U.S. passport card and adding someone else's information is clearly covered by those other sections in terms of misusing it and using it. I don't have... Well, it doesn't cover possession. 1543 doesn't cover possession. Yes, I will need to take a look at the other 15s that are in there. And that's what he was charged with, among other things, in this case, if you could go back and look at the indictment. Yes. The way that it was charged in the indictment certainly tracks the language of the statute. But in terms of the conduct that he engaged in, it was criminal under other sections of that section. Right. Except possession. I mean, mere possession of a cultured... Yeah, it's not criminal under... Use is, but not possession. But he did use it. But he also possessed it, and he was charged with possessing it. Well, I mean, but he presented it to Earth Class Mail to open the account. Right. I don't think they charged him with possessing it like it was on his person, and they couldn't have because it was only a photocopy. Well, the indictment said possession. But isn't your strongest argument that if Congress wanted to include passports, they have this long list of documents, and they knew how to use passports in 1543, that they could have just added the word passport to 1546? And I think they've had multiple different opportunities to do that. I mean, and I do think that it's important to go back and see that these basically came from two different families. I mean, the set of statutes come from two different families and went through a process where they were combined and consolidated, and that didn't happen at that time. And these changes to 1546 since that time don't change that fundamental fact. But don't you have a hard time getting around that language or other document? I think in our opening brief we argue that Begay addresses that. I mean, is it other documents of like kind? He used the word such, and in Kerstick we said such means immigrant or nonimmigrant. Right. I mean, exactly. So Kerstick says that, and that's like one, I think, very solid argument in terms of how to interpret the statute. And now responding to Judge Bennett's question, I think there's another solid argument, which is when you look at the specific listing, then the other documents is informed by the specific listing. So it's not just any other document, because otherwise we could just have documents, right? We could get rid of the entire predecessor words and just have the words documents prescribed for entry. Right. I mean, and that's what Begay says, is that when you have a listing of specifics, it informs the more general language that follows. I mean, so it is a question that I think the unpublished decision is in conflict with Kerstick at a minimum. I think that the legislative history, if we're going to look at it, supports that it came from two different families, and Congress never did add that word, and they clearly could have. And the general rules of statutory construction, both the analysis in Kerstick and the like with like rule all support the interpretation that we are proposing to the court. Well, does Kerstick stand for the proposition that 1546 is ambiguous, in every respect, or, you know, I thought it was just with regard to any such. I mean, I think that's the specific holding of Kerstick. You're running out of time. Could we talk about the restitution and, in particular, your argument about why the, I guess, there were over, there was another case, and it was dismissed as to him. And that was used as relevant conduct in the restitution. Yeah, it was used as both relevant conduct for loss and... Also to calculate restitution. So there's, you know, mail fraud and other things, but there's a scheme alleged in the first indictment, the one that we are here on, the one he was convicted of after jury trial, and the indictment alleges that it continued up to and including April 15th of 2008. The second indictment is a conspiracy, and it alleged that that all happened in 2009. And the government had both of those cases outstanding. He went to trial on the first one, and then sort of partway through the sentencing proceedings, the government said, we're just going to go ahead and dismiss that as to him. The co-defendants have bled out because we're going to roll it all into the first case. But I think that the law is crystal clear that although you can clearly take the losses that are a result of the scheme, we need to look at the scheme that he was convicted of. This isn't a plea agreement case. There were no other side deals. There is a scheme he was convicted of. They just out and out dismissed the other action against him. Yes. And so our position is... Is there any record of why they did that? Well, I think it would have been a lot of trouble to go to trial against a pro se defendant. I'm obviously speculating. And they figured they had enough to get their big sentence. But they can't get their big restitution. And that would be our position in terms of the scheme ended April 15th, 2009. Can't fold in next year's losses. So they're not relevant conduct. Well, our position is also that it's not relevant conduct, different legal standard. But we have addressed that in detail in the briefs. Thank you, Counsel. Thank you. May it please the Court. Joseph Orobon on behalf of the United States. To pick up where you left off, Judge Warlaw, the reason why the case was dismissed, it's articulated in the record, was that Judge Benitez had asked the government, can all of this just be considered the second case as relevant conduct? And the government's position from the very, very beginning after trial of Mr. Thompson was that it very well could be considered relevant conduct. And so it was the government's position that there should actually be a hearing on whether or not it was relevant conduct so that Mr. Thompson could test that theory and have an opportunity to cross-examine witnesses, which is exactly what happened in this case. And I know that there's a contention that there was a time limit associated with that hearing. But a few of the things that I wanted to point out. Can I just ask, is it your position that it is relevant conduct under the relevant conduct standard, which has to be part of the same course of conduct or common scheme or plan? Yes, Your Honor. And there's two reasons for that. One, Counsel noted that there was a conspiracy charge in the second case. But there was also a wire fraud charge. And in that wire fraud charge, if you compare the two indictments, the scheme to defraud and the mail fraud charge in the first case and the wire fraud charge in the second case, the scheme is the same. It's the same modus operandi. Mr. Thompson engaged in filing false tax returns. But it involved different people in different locations in different years with different documents. No, Your Honor. With all due respect, I disagree. There were similar victims involved. But if it had been. But there were different victims. Yeah, there were taxpayers. I mean, they were all similar taxpayers. But if they were so similar, why didn't you indict both schemes together? And the reason why that did not occur, Your Honor, is because the first indictment was brought in 2010 right after Mr. Thompson was arrested. The evidence for the second scheme was contained on a computer device that had been seized at the border. A search warrant was executed on that device. And it took the IRS a year and a half or so to investigate that second scheme. It took them a long time to identify those co-conspirators because their names and identities were nowhere to be seen on the computer other than a photograph and an initial that the agents had. And so that's why the two cases weren't charged together. But to go back to your point, Judge Bennett, it is the same victim. And it's the victim that counsel continues to harp on in their brief. It's the IRS. The IRS is the victim. They're the ones that are the victim of the scheme because they're the ones that And so they are the same victim in both cases. There are a few of the same victims also in the second case. Mr. Davis, Daniel Davis, Mr. Joseph Covington, and Mr. George Thompson is also a victim because it's his wireless card that Mr. Thompson used to file the false returns. But the scheme itself is the same in both cases in the very beginning of the second case. In the very beginning of the second case, Mr. Thompson rents an apartment at Bayview Towers and does exactly what he did the year before. He files, using the identities of his clients and Jackson Hewitt clients, false returns electronically without the co-conspirators. So the scheme did cover two tax years. All right. So you're going to probably have to make that argument below on resentencing. But as for the restitution, the restitution can only arise from crimes of which he was convicted, and he wasn't convicted of the other scheme. The case law that I cited in my brief is that it can include related conduct. Meredith, I think, holds that. United States v. Meredith holds that related conduct and even uncharged conduct can be included in restitution. And so we do have a situation. We actually don't have a situation in this case where there's uncharged conduct because Mr. Thompson was indicted in the second case. But even had the government not brought that second case, I would still contend that the Ninth Circuit precedent supports the fact that that related conduct in the second case could still be used to make the IRS whole for the losses that they suffered from both schemes. Now, the reason why there's a temporal difference in the scheme is because look at the nature of the scheme itself. It's tax fraud. It's going to occur between January and April of each year because that's when tax filing season is. So there is a reason why there's that intervening period between the two schemes. They're the same scheme. It's the same modus operandi, the same victims, the same monetary goal that Mr. Thompson was seeking. To discuss the restitution hearing itself, at that restitution hearing, the government did what it could to assist Mr. Thompson himself. He made that decision almost a year and a half before the restitution hearing occurred. He did have standby counsel at that hearing. The government submitted detailed declarations of the direct testimony of the witnesses it intended to call more than two weeks before the hearing so that Mr. Thompson had adequate time to prepare for cross-examination. In fact, the government stated that it did not intend to call the witnesses for direct and that Mr. Thompson could use the entire time to cross-examine the witnesses. Mr. Thompson sent a letter to the government that was noted in the record that he was prepared to go forward. He asked the government to load exhibits onto a computer to bring an Elmo to the courtroom. The government did that. And you'll see throughout the hearing that Judge Benitez, he was trying to help Mr. Thompson. I'll note several situations where Judge Benitez asked follow-up questions because as you read the record, it's very difficult to see what point Mr. Thompson is trying to make. He's simply arguing with Agent Druin because she was a witness who testified at the first trial and he wanted an opportunity to cross-examine her himself. But Judge Benitez asked several pointed questions at ER 77, 83 to 84, 92, and then had a long discussion with Agent Hurlburt at 125 to 130. So the court was actively engaged. In fact, the government was actively assisting Mr. Thompson when he couldn't find exhibits during that hearing. In locating those exhibits, in placing those exhibits before the witnesses for Mr. Thompson. And so I don't think that the court committed any sort of error by limiting the time frame, because as this Court knows, it's worse to limit the subject matter than to limit the time frame. And the district court has to be able to control its proceedings, which is what Judge Benitez was doing in this case. With regards to the 1546 charge, I want to go back to some of the questions that Judge Wardlaw had with respect to any such in Christick. And I don't think Christick conflicts with Franklin at all. As a matter of fact, what Christick was trying to decide is something entirely different than what this Court is asked to decide about whether or not 1546 applies to a U.S. passport card. Christick was trying to decide whether or not an authentic alien registration card could fit within the confines of 1556. It didn't have to just be a forgery. It could actually be possession of an authentic document that was procured by a false statement. And that was what the Ninth Circuit was trying to decide in Christick. I charged this case in 2010, and I didn't find a single case that said a United States passport card is a passport. I venture to guess had I charged 1543 in this particular case, the argument would be that the plain language of 1543 doesn't say United States passport card. It says United States passport, and everybody understands it. You can see that now, though, right? Now I can see that, of course, because I have cases like Franklin, which was decided in 2011 after I indicted the case in 2010. So I now have case law and analysis to show that I could make an argument that passport card would fit within 1543. But it's not this Court's position to decide what's the best statute that the government could have charged. It's whether or not the conduct fits within the statute that is charged. And I contend that it did because of the other document clause. When I looked at the other document clause, I just read the plain meaning that said, an other document provided by statute or regulation for entry into the United States. And that was a United States passport card, which was a relatively new document that had been issued when I charged the case in 2010. And so when I was analyzing 1546, I not only wanted to consider his fraudulent use of the passport, but to Judge Bennett's point, he did possess the document. It was on his computer. Given that it was a new card, which we know is used, is issued by the State Department to only U.S. citizens and only for the purpose of allowing, easing the transition of border crossing between our neighboring States, given that it was uncertain whether that was a passport or what it was in 2010. Don't you think that at a minimum, Mr. Thompson should benefit from the rule of lenity? No. I think that the rule of lenity, I think, should be used with caution in a case like this because I do think that 1546 does apply to United States passport cards. Does it apply to passports? It applies to United States passports because 1324A, small a, was promulgated at the same time. In 1986, Congress wanted to expand the scope of 1546. Right. Yet passports existed and it didn't add the word passport. No, it did not. Though if it had wanted to expand it to passports, and what's that rule? Exclusio uno, whatever. Yes. But instead what Congress did is it issued this catch-all phrase that does capture United States passports. I agree, Your Honor, if they wanted to specifically. Why would it feel that the next statute over, I mean, in the same group of statutes that already have extensive criminalization of passport use or misuse, why would it feel that it needed to extend 1546 to passports or their seeming equivalent passport cards? It was trying to expand. I think at the time in 1986, Congress's intent from the legislative history was to the fact that it promulgated 1342A, which does apply for purposes of employment authorization. It's specifically tied to that. It doesn't deal with entry or entry into the United States, which 1543, I think, is more significantly tied to. The two specific things that it added had to do with aliens, correct? In 1546? When they amended the statute in 1986. It didn't just specifically apply to aliens, because that would be detrimental to my ---- The two specific things they added. What did they add? What two specific categories of documents did they add in 1986? They added the alien registration card, I believe, and the border crossing card. So, correct, yes. They added the ---- Those are for aliens. They are for aliens, Your Honor, yes. Okay. So doesn't that support Ms. Ivins' argument? No, because then we would stop. They wouldn't have added the catch-all phrase, other documents prescribed by statute for entry into the United States. They could have ended it if they wanted to limit it specifically to just alien documents. Congress could have just stopped right there and ended it with just those examples. But how do you deal with the role of the gay? Well, again, I contend that the statute itself still, even under the legislative history and the plain meaning of the statute, clearly applies to the document that was charged, the United States passport card, because it is a document for entry into the United States. With regards to the ---- But certainly Congress didn't intend to apply to a passport card because they didn't exist yet. Correct. But they included that catch-all phrase so that it could cover more documents, because at the time they were having ---- Campo Serrano was trying to limit what types of documents were being used. And so Congress decided to go against Campo Serrano and expand the scope of 1546. The most obvious document you would have added would have been a passport. If you wanted to add documents, it's by far the most prominent of all, far more prominent than the ones that are listed. I agree, Your Honor. It could have been ---- But they didn't add passports. They didn't, because they added the catch-all phrase, that includes passports. They added a phrase that is more general and will capture the passport, because a passport, as everybody knows, is a document that's for entry into the United States. Does the legislative history support your view that that phrase included passports? I think it does. I think 1324A, because it was promulgated at the same time and because that was the time when they were instituting a new verify system for employment authorization, they specifically mentioned passports. That's why every argument you make seems to support this notion that that statute is aimed toward aliens. In the e-verify system, that was for people to determine whether or not people were authorized to work in the United States. Well, it's not aimed towards aliens because the charge itself begins with whoever, and whoever can be charged with this crime. And so if they wanted to limit it to aliens, Congress could have said any alien knowingly forges. This statute could be used, I would contend, for a United States citizen who's maybe a fugitive in the United States and takes an alien registration card and tries to enter the United States using that. That United States citizen could be charged under 1546 for misuse of that alien registration card, for trying to sneak back into the United States, because the statute says whoever can be liable for that charge. With regards to whether or not the court should remand on an open or closed record, I want the court to understand that Judge Benitez, and I know I'm running out of time, noted that we killed a small forest in this particular case. The evidence of the other victims is in the record. It's in the tax transcripts on two disks. Does that mean you are satisfied with remanding on a closed record? I don't think that this court needs to remand on a closed record. I think the general rule is to remand on an open record. But you're worried about all the trees that have already been killed. I think that the reason that the government would need to add a witness to explain what the codes in those tax transcripts mean, in order to show that the victims, the taxpayers, actually suffered a delay in their refunds. Do you want to add one witness, is that it? There would only need to be one witness to articulate and explain what the codes in those transcripts meant. So you would be satisfied with a closed record other than adding one witness? I would be satisfied with a closed record other than adding that one witness to explain the codes in the transcripts to prove that victim. All right. Will you submit a letter to us saying what victim you – what witness you want to add? Yes, sir. And then we'll give your opponent a chance to respond. Very well. Thank you, Your Honor. Thank you. Unless you can tell us now that you would have no objection to their adding one witness. I am confident that I should check with Mr. Thompson before I make that representation, Your Honor. All right. Well, when we receive the letter from Thompson, you will respond. I will check with him when I get back to my office. And we're fairly confident he won't agree, but I'm just kidding. Briefly, the scheme is the scheme he was convicted of for restitution, and nothing the government says can make it broader than that under the law. And I am confident that the law clerks who work for Your Honors will do a better job than I am going to do at this, but I just want to briefly say how I read the legislative history on 1546. You know, we may actually read it ourselves. Okay. That is a good point, Your Honor. Just rely on law clerks. I don't know how your office works, but we read things. I do my own research, Your Honor, except for when we are privileged enough to have students who come and work with us for the summer. Yes. Well, and some of our law clerks who work for you. In 1924, it was enacted, and it said any immigrant visa or permit. In 1948, it got converted and added into the other section, and it was renumbered as Section 1546. In 1952, immigrant or nonimmigrant visa, permit, or other document required for entry into the U.S., and then that's when, in 1971, the U.S. Supreme Court decided Campo Serrano regarding green cards and said, hey, they're not in the list. And it only took about 12 years to amend it, right? And then in 86, Congress responded to that decision and changed it to prescribed instead of required. And so I would just take issue with the government's argument that the other document somehow got added in 1986, because if my research is accurate here, it was in 1952. Thank you. Thank you very much. Thank you both for a very interesting argument. The case just argued will be submitted. The final case of the day for oral argument.
judges: Reinhardt, Wardlaw, Bennett